In re Pascal **MORAHAN**.

In re Daniel **CRAWFORD**.

In re Mathias **REILLY**.

In re Thomas **LAFFEY**.

Misc. Nos. 54–57.

United States District Court,
N. D. Texas,
Fort Worth Division.

July 3, 1972.

859

Frank McCown, Asst. U. S. Atty. for the Northern District of Texas, Brandon Alvey, Robert W. Merkle, Department of Justice, Washington, D. C., for the United States.

## OPINION

BREWSTER, Chief Judge.

### General Summary

Pascal Morahan, Daniel Crawford, Mathias Reilly and Thomas Laffey were each held in civil contempt of this Court for failure to obey its order, entered after a grant of immunity under Title 18, United States Code, Sections 6001, 6002 and 6003, directing him to testify before a grand jury of this Court then in regular session. Each one of them was committed to the custody of the United States Marshal of this District until he purged himself by giving his testimony, or until the grand jury was finally discharged, whichever happened first.

■ Though the proceedings were filed separately, they involved the same issues [1] and the same counsel; and they arose out of the same transactions.

Another such matter, Misc. No. 52, In re Kenneth Tierney, had been heard before these were filed; otherwise, it would have been consolidated with this proceeding. On June 29, 1972, the Court of Appeals upheld the order of this Court denying bond pending appeal, No. 72–2333, Kenneth Tierney v. United States of America. The record in that case was adopted by reference in this proceeding so it will probably have to be consolidated with this one on appeal.

The ultimate question in the proceedings involving each of the five witnesses [2] is whether the immunity granted them under Title 18, United States Code, Sections 6001, 6002 and 6003, is adequate to protect these witnesses under the particular circumstances of the

Doris Peterson, Frank Durkan, William Cunningham, New York City, for the witnesses.

---

1. If the views of counsel for the witnesses are accepted, there could be an issue as to the two witnesses they claim to be British subjects that would not involve the others. Such counsel made an unsworn statement that two of the four wit-

nesses were British subjects. There was no proof to that effect; but even if there had been, the four proceedings should have been consolidated.

2. Tierney makes the fifth witness.

transactions here involved.[3] There is an interim question of whether any or all of these witnesses should be allowed bail pending their appeal.

The Government has not disclosed the exact nature of the transaction being investigated. Counsel for the witnesses claim that it is one involving the purchase of weapons for shipment to the Irish Republican Army in Northern Ireland. There are some circumstances which support the inference that the investigation involves a gun-running conspiracy to collect firearms to be smuggled to the I. R. A. Some of the questions propounded to the witnesses related to whether they had made illegal purchases of any firearms, or had loaned their drivers' licenses to others for use in making such purchases. There were several tirades by one of counsel for the witnesses against the conduct of the British in Northern Ireland. Representatives of the British news media have personally covered all of the proceedings involving Tierney as well as these witnesses. Irish people in the United States on visas have picketed the courthouse during this hearing.

Some idea of the magnitude and seriousness of the transactions involved can be gained from the fact that the Department of Justice has sent two of its top legal specialists in terrorist activities to assist the United States Attorney, and the witnesses have been represented by three New York lawyers of the type who would be sought by persons in serious trouble. One of them, Doris Peterson, specializes in representing persons who are resisting giving grand jury testimony. Another one, Frank Durkan, is associated with widely known Paul O'Dwyer of New York. Durkan and William Cunningham have been defense counsel in such famous cases as the recent trial of Father Berrigan and others in Harrisburg, Pennsylvania. Counsel for the witnesses made the unsworn statement in this proceeding that they had collected no attorneys' fee from these witnesses. There is no proof on that matter. The three of them have been in Texas almost two weeks. It stands to reason, however, that these are people who are very much interested in seeing that these witnesses do not testify, as it would be in the interest of the witnesses to gain immunity by giving their testimony.

Counsel made the claim of wiretapping of the telephones of each of the witnesses and of the lawyers, and of electronic surveillance of some or all of such persons. To avoid delay, the Court permitted the claim to be made more informally than it usually is, and considered it on its merits. The Government made a sworn denial of wiretapping and electronic surveillance of any of the witnesses at any time.[4] The Court permitted counsel for the witnesses to fix the period during which they claimed there might have been some illegal surveillance of them or their telephones, in regard to the matter here involved, and called upon the Government to affirm or deny the claim. Counsel said that the period began with the time Tierney employed Mr. Durkan on Tuesday, June 14, 1972, and ended with their departure from New York for Texas on the afternoon of Sunday, June 18, 1972. They gave the office telephone numbers of attorneys Durkan, Cunningham and Peterson and the home telephone numbers of Peterson and Cunningham. They did not request the home telephone number of Durkan nor did they announce its number in court. They gave the name in which each telephone number an-

---

3. There can be no question about the validity of the immunity granted under 18 U.S.C. §§ 6001, 6002 and 6003 or of its adequacy generally, since the decision in Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

4. Mr. Alvey, Special Attorney for the Department of Justice, who has had supervision from the beginning of the investigation of the transactions being inquired into by the grand jury, took the witness stand under oath to make the denial, and subjected himself to cross-examination.

nounced was registered.[5] The Government denied that any of such telephones had been tapped during such period [6] or that there had been any electronic surveillance of any of the lawyers. The Court considers that such denial is reliable, and finds that there has been no illegal electronic surveillance of the witnesses or their lawyers.

The Court denied bail for each of the witnesses pending appeal. Anyone who has had the extensive experience of the author of this opinion in the defense of criminal cases would necessarily be a strong believer in bail. As was pointed out in the findings and conclusions in the Tierney case, this Judge has denied bail pending appeal only to one person under sentence during the almost eleven years he has been on the bench. That was to a well known gang leader [7] who had several cases pending against him besides the one in which he was convicted in this Court. Shortly before the trial, the partially decomposed body of a key witness in one of the other cases was found in a remote field with a bullet hole between his eyes. The Court concluded that if Flanagan were released on bond pending appeal, the remaining witnesses in the other cases would be intimidated or injured and denied bail. That ruling was upheld by the Court of Appeals in an order signed by Chief Judge Brown and by an order of the Supreme Court signed by Mr. Justice Black. The statement made in the Tierney case is repeated—that there is no intention of comparing these witnesses to Flanagan. That case is referred to only for the purpose of showing that it takes an extreme case to get this Judge to deny bail pending appeal.

Bail was denied in this case because the Court felt that the release of these witnesses on bail would end the investigation. Counsel for the witnesses put up the usual arguments that the persons committed have made every appearance required up to this date, and that they have family ties which would hold them.[8] While these factors are to be considered, they are far from conclusive. The matters of importance in making bail bonds, like almost everything else, have changed with the times. Only a few years back, travel was difficult, strangers in a community were more noticeable, jobs were harder to find, and there was no Government relief to take care of abandoned families. All those things are different now, and a fugitive can travel a long distance and get "lost" in a new community in a matter of only a few hours. Also, in case involving a number of people enmeshed in a serious crime, it is easier to dispose of a witness now and get away with it than it was only a few years ago.

There are good reasons here why there is little merit in the contention that the witnesses have made every appearance so far. (1) Time is obviously worth a lot to the people they are trying to protect by not testifying. They can gain substantial delay by appearing for the grand jury proceeding, refusing to testify, and appealing. If they can get bond pending appeal, very little is lost. (2) By going before the grand jury, and reporting the questions to their lawyers, they stand a chance to get valuable knowledge about the information the Government has. (3) They can take the gamble of being successful in resisting the efforts of the Government to make them testify. They can disappear when they learn they have lost. That appears to be the style now. As was mentioned in the Tierney findings and conclusions,

---

5. One of the telephones was in New Jersey. All the others were in New York.

6. This statement is not meant to imply that there had or had not been any wiretapping at any other time. Everyone, including counsel for the witnesses, recognized that the only period which could be material in this proceeding began at the time the first one of them was initially consulted by any of these witnesses about the transactions here involved.

7. His name was Walter Mark Flanagan.

8. There is no proof that any of them have families, much less what their respective families consist of or of their relationship to their families.

only recently the Federal Court in this District had four men who were fugitives on appeal bonds at the same time. Each one of them made every appearance required until he learned his case had been affirmed. They were defendants in unrelated cases. One of them has never been apprehended.

The other contention about the family ties must be weighed in the light of the circumstances of the case. The question is whether there are possible pressures which might override the natural inclination of the witnesses to remain with their respective families. The Court is of the opinion that there are such pressures in this case. If this investigation does not involve an illicit scheme to smuggle firearms and explosives to the Irish Republican Army, the bond should be denied because, under the *Kastigar* case, there could be no possible merit in the appeal. If it does involve such a scheme, then it is common sense that the underground could get the witnesses out of this country and furnish them an asylum until time might take care of the situation. With a terrorist group involved, the witnesses would be afraid to show up if they knew they had to give their testimony. It is not out of the question that they would not even be around if they gave the slightest inclination to testify before the grand jury.

The case is even stronger against the two who claim to be British subjects. They would have a place to go where they could blend in with their own kind of people.

The statements in this general summary are to be considered along with the findings of fact and conclusions of law. There is necessarily some repetition.

## FINDINGS OF FACT

1. All the witnesses were served with subpoenas during the period beginning with June 13, 1972, and ending with June 16, 1972.

2. At least by June 16, 1972, all witnesses had engaged the services of Frank Durkan, William Cunningham and Doris Peterson.

3. Attorneys Durkan, Cunningham and Peterson came to Texas on Sunday, June 18, 1972, and have been present at the courthouse at all relevant times subsequent thereto.

4. The attorneys are obviously experienced and well versed in this type of proceedings and were unusually well prepared. The four contempt applications of the Government are identical with the one filed in the Tierney matter.

5. Attorneys Brandon Alvey and Robert W. Merkle are attorneys employed by the Department of Justice assigned to the Internal Security Division, and were lawfully appointed Special Attorneys for the purpose of conducting, in the Northern District of Texas, a grand jury investigation concerning possible violations of Title I of the Gun Control Act of 1968 (18 U.S.C. § 921 et seq.), Title II of the Gun Control Act of 1968 (26 U.S.C. § 5861), Title XI of the Organized Crime Control Act of 1970 (18 U.S.C. § 842 et seq.), Foreign Agents Registration Act (22 U.S.C. § 611 et seq.), and Conspiracy (18 U.S.C. § 371). One of their specialities is matters involving terrorist activities.

6. Before the grand jury was in session on June 19, 1972, attorneys Alvey and Merkle duly, lawfully and properly executed their oaths of office, which oaths are on file with the United States District Clerk, Fort Worth, Texas.

7. The grand jury referred to herein at all times had more than sixteen members of its body present in the grand jury room and its Foreman, Franklin I. Earney, Jr., was present and presiding.

8. The witness Laffey first appeared before the duly and lawfully constituted grand jury in regular session in the United States District Court for the Northern District of Texas impaneled on May 2, 1972, at Dallas, Texas, sitting for the Fort Worth and Dallas Divisions of said District on June 22, 1972. The witness Reilly first appeared before the said grand jury on June 21, 1972. The

witness Morahan first appeared before the said grand jury on June 22, 1972. The witness Crawford first appeared before the said grand jury on June 21, 1972.

9. Each witness was called before the grand jury in accordance with his subpoena. Each one was asked to state his name, and he did. During each witness' appearance before the grand jury, he was asked a series of questions, each of which concerned the matters under investigation. After each question so asked, the witness sought permission to confer with his attorneys. This permission was granted in each instance. After conferring with his attorneys, the witness refused to answer each question, claiming protection under the Fifth Amendment of the Constitution of the United States. Each witness also cited for his refusal to testify the First, Fourth, Sixth and Ninth Amendments of the Constitution of the United States and the entire United States Code.

10. It is obvious that none of the witnesses intended to testify and sought only to delay and obstruct the proceedings before the grand jury. For example, with the witness Laffey the following colloquy occurred when he first appeared before the grand jury:

FOREMAN: Mr. Alvey, would you explain to this witness his rights before the grand jury?

MR. ALVEY: Yes sir, Mr. Foreman. Mr. Laffey, is that the way you pronounce your name?

THE WITNESS: I would like to ask my attorney about that.

On his first grand jury appearance, the witness Reilly asked to be advised of his rights and after much harangue and after consultation with his attorneys, the following occurred:

Q. (Continued by Mr. Alvey): Mr. Reilly, you have just returned from consulting with your counsel?

A. Yes Sir.

Q. I am sorry, I did not hear you.

A. Yes Sir.

Q. Has your counsel advised you as to your rights?

A. I would have to consult my counsel, sir, Mr. Foreman?

The witness Morahan opened his first testimony before the grand jury in the following manner:

MR. MERKLE: You are represented by counsel?

THE WITNESS: Yes Sir.

MR. MERKLE: Mr. Morahan, would you please tell the grand jury who represents you?

THE WITNESS: I would now like to inform my counsel of this response and seek their advice.

After the witness Morahan left the grand jury room, presumably to consult with counsel, the following occurred:

MR. MERKLE: Mr. Morahan, have your three counsel advised you of your rights as a witness before the grand jury?

THE WITNESS: Mr. Foreman, I would now like to inform my counsel of this response and seek their advice.

The witness Crawford opened his first testimony before the grand jury in the following manner:

FOREMAN: Would you please give this grand jury your name?

THE WITNESS: Daniel Crawford. Can I see my attorney anytime I want to?

MR. MERKLE: We have no objection to your conferring with your counsel. We would ask that you direct such request to the foreman of the grand jury.

THE WITNESS: Can I see my lawyer anytime I want to?

FOREMAN: Anytime you request permission, sir.

THE WITNESS: I must consult my lawyer.

The witness Crawford left the grand jury room; but, at that time, there was nothing to consult his lawyer about. His only reason was to delay the grand

jury for the time he was gone. Later, the following occurred:

Q. Mr. Crawford, we understand that you are represented by counsel although I did not ask you that question yet. Has your counsel advised you of your rights?

A. Yes Sir.

Q. Do you understand your rights?

A. I must consult with counsel, please.

He left the grand jury room to consult his attorney about his own state of mind!

11. On June 23, 1972, the United States Attorney filed four applications seeking grants of immunity separately for each of the witnesses Laffey, Reilly, Crawford and Morahan under the provisions of Title 18, United States Code, Section 6002. A copy of this application was served on each witness who appeared in open court with all of his attorneys (except Mr. Durkan who was at the dentist office). The United States Attorney had served copies of the four applications on the attorneys for the witnesses at 1:18 P.M. on June 23, 1972. Counsel for the witnesses asked that the hearing be adjourned until Mr. Durkan could return from the dentist for the reason that two of the witnesses spoke Gaelic and needed to confer with Mr. Durkan in Gaelic. Although the witnesses had no trouble communicating with the Court and no request had ever been made for an interpreter, and the witnesses had conferred with the grand jury and had no difficulty understanding nor responding to the grand jury, still the Court granted the request and scheduled the hearing for 3:30 P.M. on June 23, 1972.

12. At 3:30 P.M. on June 23, 1972, all the attorneys appeared with all the witnesses and requested additional time to prepare to oppose the immunity request. The attorneys requested an additional five days for the purpose of preparation. The attorneys were so well prepared as to the applicable law and the facts of the case that it was deemed unnecessary to grant additional time before a hearing on the motions to grant immunity. All issues were identical with those which had been litigated in the Tierney case during the previous week.

13. The hearing on the motion of the government to order the witnesses to testify after being granted immunity began at 3:30 P.M. on June 23, 1972.

14. Counsel for the witnesses had prepared affidavits which they represented to the Court would raise the issue of electronic surveillance upon each of the witnesses. These affidavits, unsigned and unsworn to, were submitted to the Clerk for filing. Whereupon the Court ruled that if the affidavits were signed and sworn to and filed, he would accept them in eviednce in the case; but that since the affiants were present in court, he would allow the government the right to question each witness under oath but only as to the matters stated in the affidavits. Whereupon the proposed affidavits were withdrawn and not filed.

15. The Court stated that in the interest of time he would treat the issue of electronic surveillance as raised, and called upon the government to affirm or deny wiretapping and electronic surveillance upon each of the witnesses. Whereupon Special Attorney Alvey was placed under oath and testified. Mr. Alvey testified that he had caused a search to be made of appropriate federal agencies which search disclosed that there had been no wiretapping or electronic surveillance of any of the witnesses and no overhearings of them on any electronic surveillance at any time. Witnesses' counsel then questioned Mr. Alvey as to whether or not there had been any electronic surveillance of the office or home telephones of Attorneys Durkan, Cunningham and Peterson, and gave the numbers of each of such telephones. One of them was in Leonia, New Jersey, and the others were in New York City. Mr. Alvey had no information concerning those telephones as it was the first time he had heard of them

or the issue had been raised; and consequently he could neither affirm nor deny under oath the existence of such electronic surveillance.

16. Even though the issue of electronic surveillance was not raised by any evidence, either testimonial or through affidavits, but only through the oral unsworn statements of witnesses' counsel, the Court ordered the government to make the necessary check to be in position to give a reliable affirmance or denial under oath of the existence of such electronic surveillance against the attorneys for the witnesses. The time was approximately 5:30 P.M. on Friday afternoon, June 23, 1972; and the Court recessed the hearing until 10:00 A.M. on Tuesday, June 27, 1972, to make such check.

17. On June 27, 1972, at 10:00 A.M., all the witnesses reappeared with all their counsel and the government was represented by Special Attorneys Alvey and Merkle and Assistant United States Attorney Frank McCown. Mr. Alvey, still testifying under oath, testified that he had caused the records of the appropriate government agencies to be searched, and at that time he denied under oath that there had been any electronic surveillance against the telephone numbers of the attorneys which were read into the record on Friday afternoon, June 23, 1972, and any overhearings of any of the attorneys during the time of their employment as attorneys for the witnesses. The Court had asked counsel to state the period they wanted covered as to them, and they stated that Tierney's contact with Attorney Durkan on June 14, 1972, was the first conversation as to this matter between any of the witnesses and any of them. Counsel said that the period they wanted covered began with that contact on June 14th and ended with the time of their departure from New York for Texas on the afternoon of June 18th. Mr. Alvey's denial of wiretapping and electronic surveillance of the lawyers for the witnesses covered the full period specified by such lawyers.

18. The Court finds that there has been no wiretapping or electronic surveillance of the witnesses Laffey, Reilly, Morahan and Crawford or any of their attorneys.

19. The Court thereupon ordered that the grant of immunity under Title 18, United States Code, Sections 6001, 6002 and 6003 be approved as to each witness, and that each witness answer all questions propounded to him by the grand jury or under its direction. A separate written order to such effect was entered as to each witness. Copies of the orders were served on each witness and his counsel. In addition to the order granting immunity as to each witness, the Court directed each witness to answer questions propounded to him or at its direction without leaving the grand jury room after each and every question and not to leave the grand jury room without permission of the Foreman. Whereupon the Court read its order in open court as it pertained to each witness separately.

20. Thereafter, the grand jury reassembled to the grand jury room, a quorum thereof being present, together with the Foreman, Special Attorneys and Assistant United States Attorney McCown, and the official court reporter, and the following proceedings were had:

The witness Thomas Laffey was recalled before the grand jury and following questions were propounded to him and the following responses were given by the witness Laffey:

MR. ALVEY: I want the record to reflect that Mrs. Pearson is the reporter that has been taking down and transcribing the notes of the witnesses and has been sworn by you, Mr. Foreman.

FOREMAN: Yes sir, she is.

(Witness enters)

FOREMAN: Would you please give your name to the Grand Jury again.

WITNESS: Mr. Foreman, my name is Thomas Laffey.

FOREMAN: I would like to inform you that you are still under oath as ad-

ministered to you at your first appearance before this Grand Jury.

MR. McCOWN: Mr. Foreman, for the purpose of the record, since we have not been in session today, is this a United States Grand Jury for the Northern District of Texas, sitting in Fort Worth for the Dallas-Fort Worth Division?

MR. McCOWN: Your name is Franklin Earney?

FOREMAN: Yes sir.

MR. McCOWN: And you are the Foreman of this Grand Jury?

FOREMAN: Yes sir.

MR. McCOWN: Have you caused the role to be checked today?

FOREMAN: Yes sir, we have checked the role today.

MR. McCOWN: And are there at least sixteen qualified members of the Grand Jury present?

FOREMAN: Yes sir.

MR. McCOWN: Besides the witness, the court reporter and the special attorneys and myself, is there anyone else in the Grand Jury room at this time?

FOREMAN: No sir, there is not.

MR. McCOWN: The time is now 4:04.

FOREMAN: I would like to ask that the U.S. Attorney's office and the special attorneys conduct the questioning of this witness for the Grand Jury.

MR. ALVEY: Thank you, Mr. Foreman.

DIRECT EXAMINATION

BY MR. ALVEY:

Q Mr. Laffey, you were present in the Court Room just a few moments ago when Judge Brewster read his order, were you not?

A (Witness nods head)

Q And you heard the order read?

A (Witness nods head)

COURT REPORTER: Would you please have your witness speak out instead of nodding his head.

MR. ALVEY: I think the reporter has a point.

Q. Mr. Laffey, were you present in the Court Room just a few moments ago when Judge Brewster entered his order granting you immunity?

A Mr. Foreman, I would like to seek my attorneys' advice on this.

MR. ALVEY: Mr. Foreman, you were present and overheard the Court's Order, did you not?

FOREMAN: Yes sir, I did.

MR. ALVEY: If my memory is correct, Mr. Foreman, the Judge stated a witness should not be allowed to leave the Grand Jury room, after having been granted immunity, without the permission of the Foreman.

FOREMAN: That is correct.

MR. ALVEY: Mr. Foreman, do you wish to allow the witness to talk to counsel on this fundamental question?

FOREMAN: Not at this time. Will you please proceed.

Q Mr. Laffey, in order to avoid continual problems with this Grand Jury, I am going to ask you some questions that were asked of you in your prior appearance before this Grand Jury. I will ask the questions to you word for word as they were posed to you before. These are questions that Judge Brewster ordered you to answer.

On June 22 of 1972 when you appeared before this Grand Jury at approximately 3:45 in the afternoon, you were asked this question: Mr. Laffey, have you ever received any money from any person for the purpose of purchasing weapons or explosives?

A Mr. Foreman, I would like to seek my attorneys' advise on that.

FOREMAN: Not at the present time.

Q Mr. Laffey, on the same date, at approximately 3:48, you were asked this question:

Mr. Laffey, have you ever used the driver's license of any other individual for the purpose of identification in purchasing firearms?

A   Mr. Foreman, I would like to seek my attorneys' advice on that.

FOREMAN: You may.

WITNESS: Thank you.

(Witness leaves room)

MR. McCOWN: The time is 4:07.

(Witness returns)

MR. ALVEY: The time is 4:12.

A   Mr. Foreman, on the advice of counsel, I respectfully refuse to answer that question because it violates my rights under the First, Fourth, Fifth, Sixth and Ninth Amendments to the Constitution of the United States and the relevant Sections of the United States Code and treaties concluded by the United States with Great Britain and Northern Ireland.

FOREMAN: Mr. Alvey, would you continue.

MR. ALVEY: Thank you, Mr. Foreman.

Q   Mr. Laffey, have you any knowledge of any person or persons in the State of Texas, State of New York or elsewhere who are engaged in the purchase of legal weapons illegally or the illegal purchase of weapons or explosives?

A   Mr. Foreman, I would like my attorneys' advice on this.

Q   With the limitation, Mr. Tierney, of the territorial limits of the United States.

A   Mr. Foreman, I did not understand the part about Mr. Tierney.

MR. ALVEY: I am sorry, Mr. Laffey. Let me rephrase the question.

WITNESS: Thank you.

Q   Have you any knowledge of any person or persons in the State of Texas, the State of New York, or any other state of the United States of America who are engaged in the purchase of legal weapons illegally or in the illegal purchase of weapons and explosives?

WITNESS: Mr. Foreman, I would like my attorneys' advice on this.

FOREMAN: Not at this time. Please continue, Mr. Alvey.

Q   Another question that was propounded to you on June 22 was: Have you ever purchased any firearms or explosives?

A   Mr. Foreman, I would like my attorneys' advice on this.

FOREMAN: You may.

THE WITNESS: Thank you.

(Witness leaves room)

MR. McCOWN: The time is now 4:14.

(Witness returns)

MR. McCOWN: The time is now 4:16.

A   Mr. Foreman, on the advice of counsel, I respectfully refuse to answer that question because it violates my rights under the First, Fourth, Fifth, Sixth and Ninth Amendments to the Constitution of the United States and the relevant sections of the United States Code and treaties concluded by the United States with Great Britain and Northern Ireland.

MR. ALVEY: Mr. Foreman, may I request that this witness be temporarily excused from the Grand Jury at this time and request that he be advised to stay in the corridor pending further developments.

FOREMAN: Mr. Laffey, you are temporarily excused at this time but please remain in the corridor until further notice.

WITNESS: Mr. Foreman, thank you.

MR. McCOWN: The time is 4:18.

21.   Thereafter, the witness Mathias Reilly was recalled before the grand jury and the following questions were propounded to him and the following responses were given by the witness Reilly:

MR. ALVEY: The time is 4:20.

FOREMAN: Would you please give this Grand Jury your name.

WITNESS: Mathias Reilly.

FOREMAN: Mr. Reilly, I would like to inform you that you are still under oath as administered the first time you appeared before this Grand Jury. Will

the U.S. Attorney's office and special attorneys conduct the questioning of this witness for the Grand Jury.

MR. ALVEY: Thank you, Mr. Foreman.

### DIRECT EXAMINATION
BY MR. ALVEY:

Q Mr. Reilly, you appeared before this Grand Jury on June 21, 1972, and were asked certain questions. Were you present in Court just a few moments ago when Judge Brewster granted immunity under Sections 6002 and 3 of Title 18 of the United States Code and ordered you to answer these questions?

A I would like to consult with my lawyer, Mr. Foreman, please.

FOREMAN: Not at this time. Continue, Mr. Alvey.

Q Mr. Reilly, we are going to pose some questions to you that were posed to you on your previous appearance before this Grand Jury.

On June 21, 1972, at approximately 2:35 p. m., this question was asked of you:

Have you ever furnished your driver's license, given it to another individual for the purpose of purchasing firearms?

A I would like to consult with my lawyer, Mr. Foreman, please.

FOREMAN: Not at this time. Would you continue, Mr. Alvey?

MR. ALVEY: Thank you, Mr. Foreman.

Q Mr. Reilly, have you ever purchased a number of Armalite rifles, and to aid you in this matter these are commonly referred to as AR–180, from a licensed firearms dealer?

A May I consult my lawyer?

FOREMAN: You may, and please ask them on both questions.

(Witness leaves room)

MR. McCOWN: Let the record reflect the time is 4:22.

(Witness returns)

MR. ALVEY: Let the record reflect the time is 4:27.

A Upon the advice of my lawyers I respectfully refuse to answer those questions because it violates my rights under the First, Fourth, Fifth, Sixth and Ninth Amendments to the Constitution and the United States Code and the treaties in force between the United States, Great Britain and Northern Ireland.

FOREMAN: Will you continue, Mr. Alvey.

MR. ALVEY: Thank you, Mr. Foreman.

Q Mr. Reilly, on June 21 at approximately 2:41 p. m., this question was posed to you:

Have you ever purchased or acquired illegal firearms or explosives, or purchased otherwise legal firearms illegally?

A Mr. Foreman, may I consult with my lawyer?

FOREMAN: Not at this time. Mr. Alvey, would you continue.

Q Mr. Reilly, at approximately 2:45 on June 21, this question was posed to you:

Mr. Reilly, have you ever knowingly allowed your name to be used in connection with the purchase of any firearms?

A Mr. Foreman, please may I consult with my lawyer?

FOREMAN: Not at this time. Continue, Mr. Alvey.

Q Mr. Reilly, at the same appearance before the Grand Jury you were asked:

Mr. Reilly, have you ever purchased or acquired illegal firearms or explosives, or purchased otherwise legal firearms illegally or engaged in such activities in the state of New York or Texas?

A Mr. Foreman, please may I consult with my lawyer.

FOREMAN: Yes, you may. Mr. Reilly, make sure you consult him on all three questions.

(Witness leaves room)

MR. ALVEY: The time is 4:29.

(Witness returns.)

MR. ALVEY: Let the record reflect the time is 4:35.

A I could not remember all of the questions so on the advice of my lawyers I respectfully refuse to answer those questions because they violate my rights under the First, Fourth, Fifth, Sixth and Ninth Amendments to the Constitution and the United States Code, and the treaties in force between the United States, Great Britain and Northern Ireland.

MR. ALVEY: Mr. Foreman, I request that this witness be temporarily excused from the Grand Jury and wait in the hall.

FOREMAN: Mr. Reilly, we are temporarily going to excuse you at this time, but would you please remain in the corridor until further notice.

(Witness leaves room)

22. Thereafter, the witness Paschal Morahan was recalled before the grand jury and the following questions were propounded to him and the following responses were given by the witness Morahan:

MR. ALVEY: Let the record reflect the time is now 4:39.

FOREMAN: Would you please give this Grand Jury your name again?

WITNESS: Paschal Morahan.

FOREMAN: Mr. Morahan, I wish to advise you that you are still under oath as previously administered by me at your first appearance before this Grand Jury. Do you understand?

WITNESS: Yes sir.

FOREMAN: You may be seated. Mr. Alvey, would the special attorneys conduct the questioning of this witness?

MR. ALVEY: Thank you, Mr. Foreman.

Q Mr. Morahan, you were present in court approximately forty minutes ago now, I guess, or longer, when Judge Brewster granted you immunity under Sections 6002 and 6003 of Title 18, United States Code, and read his order to you, were you not?

A Would you repeat the question, please?

Q Mr. Morahan, were you present in Court not too long ago when Judge Brewster granted you immunity under the provisions of Title 18, United States Code, Sections 6002 and 3, and ordered you to appear before this Grand Jury and answer its questions?

A Mr. Foreman, I would like to consult with my attorney.

FOREMAN: Not at this time. Please continue, Mr. Alvey.

MR. ALVEY: Thank you, Mr. Foreman.

Q Mr. Morahan, when you appeared before this Grand Jury on June 22, 1972, at that time you were asked this question:

Mr. Morahan, have you ever illegally purchased firearms?

A Mr. Foreman, can I see my attorneys?

FOREMAN: Not at this time. Please continue, Mr. Alvey.

MR. ALVEY: Thank you, Mr. Foreman.

Q Mr. Morahan, you were also asked:

Have you ever aided any person or persons in the illegal purchase of firearms?

A May I see my attorneys, please?

FOREMAN: You may. Mr. Morahan, please consult them on both questions propounded.

(Witness leaves room)

MR. ALVEY: The time is 4:42.

(Witness returns)

MR. ALVEY: The time is 4:47.

A Upon the advice of my lawyers, I respectfully refuse to answer those questions because they violate my rights under the First, Fourth, Fifth, Sixth and Ninth Amendments to the Constitution, the United States Code and the treaties in force between the U.S., Great Britain and Northern Ireland.

FOREMAN: Mr. Alvey, would you continue.

MR. ALVEY: Thank you, Mr. Foreman.

Q Mr. Morahan, do you know James O'Gara?

A Mr. Foreman, I would like to consult my counsel.

FOREMAN: Not at this time. Please continue, Mr. Alvey.

Q Mr. Morahan, have you ever given your driver's license to another individual for the purpose of purchasing firearms illegally?

A Mr. Foreman, may I see my counsel?

FOREMAN: Not at this time. Please continue, Mr. Alvey.

Q Mr. Morahan, do you have any knowledge of any person or persons who have engaged in the illegal purchase of otherwise legal firearms in the states of New York and Texas or who may have acquired or purchased illegal firearms or explosives?

A Mr. Foreman, may I see my attorney?

FOREMAN: You may.

(Witness leaves room)

MR. ALVEY: The time is 4:49.

(Witness returns)

MR. ALVEY: Let the record reflect the time is 4:52.

A Upon advice of my lawyers, I respectfully refuse to answer those questions because it violates my rights under the First, Fourth, Fifth, Sixth and Ninth Amendments to the Constitution, the United States Code and the treaties in force between the U.S., Great Britain and Northern Ireland.

MR. ALVEY: Mr. Foreman, may I request that this witness be temporarily excused and remain in the corridor pending further proceedings before this Grand Jury.

FOREMAN: Mr. Morahan, I am going to temporarily excuse you at this time, but would you please remain in the corridor until further notice of these proceedings.

WITNESS: Thank you.

23. Thereafter, the witness Daniel Crawford was recalled before the grand jury and the following questions were propounded to him and the following responses were given by the witness Crawford:

(Witness enters)

FOREMAN: Would you please give us your name again?

WITNESS: Daniel Crawford.

FOREMAN: Mr. Crawford, may I remind you that you are still under oath as administered by me at your first appearance before this Grand Jury. Please be seated.

Would the U.S. Attorney's office and special attorneys please conduct the questioning of this witness for the Grand Jury.

MR. MERKLE: Thank you, Mr. Foreman:

Q Mr. Crawford, you were present in the Court Room approximately an hour ago when Judge Brewster granted you immunity pursuant to the provisions of Title 18, United States Code, Sections 6001, 2 and 3, and you heard the Judge order you to answer the questions propounded to you before this Grand Jury, is that correct?

A May I consult my counsel, please?

FOREMAN: Not at this time. Would you continue, Mr. Merkle.

Q You have previously appeared before this Grand Jury on June 21, 1972, and at that time certain questions were propounded to you, which questions I will repeat to you at this time.

At approximately 12:41 on June 21, 1972, you were asked the following question:

Mr. Crawford, are you presently licensed to drive a car in the state of New York?

A May I consult my counsel about that, Mr. Foreman?

FOREMAN: Not at this time. Please continue, Mr. Merkle.

Q Mr. Crawford, on that same date, at approximately 12:49, you were asked

the following question which I again present to you at this time:

Do you have any knowledge of persons engaging in the purchase of illegal weapons or explosives—

A   May I consult my counsel?

Q   —or the illegal purchase of legal weapons in New York, Texas or other places?

A   May I consult my counsel, Mr. Foreman?

FOREMAN: Not at this time, Please continue, Mr. Merkle.

Q   Mr. Crawford, on June 21 at approximately 12:52 you were asked the following question before this Grand Jury, which I again repeat to you at this time:

Mr. Crawford, are you acquainted with a Charles or Liam Murphy?

A   May I consult my counsel on that, Mr. Foreman?

FOREMAN: Yes, Mr. Crawford, you may, and on all questions that were propounded to you just now.

(Witness leaves room.)

MR. McCOWN: The time is now 4:58.

(Witness returns)

MR. McCOWN: The time is now 5:03.

A   I could not remember all the questions so on the advice of my lawyers I respectfully refuse to answer all those questions under the First, Fourth, Fifth, Sixth and Ninth Amendments of the Constitution, the United States Code and the treaties in force between the U. S., Great Britain and Northern Ireland.

FOREMAN: Mr. Merkle, please continue.

MR. MERKLE: Mr. Foreman, I would suggest that we excuse this witness.

MR. ALVEY: May I point out it is now four minutes after 5:00. May I suggest, Mr. Foreman, that this witness be requested to remain. I will have the Marshal call in the other witnesses and be advised to return tomorrow afternoon at 1:00 p. m.

(Witnesses enter room)

FOREMAN: Mr. Crawford, Mr. Reilly, Mr. Laffey and Mr. Morahan, we are going to temporarily excuse you at this time and we would request that you be here tomorrow with your attorneys at 1:00 p. m.

WITNESSES: Thank you, Mr. Foreman.

(5:07 p. m.)

24. Thereafter, at approximately 2:00 P.M. on June 28, 1972, the grand jury reconvened in open court with all witnesses and their attorneys, Special Attorneys Alvey and Merkle, and Assistant United States Attorney McCown. Assistant United States Attorney McCown requested the Court leave to file a verified pleading requesting the Court to enter its order to show cause why each of the witnesses, Laffey, Reilly, Morahan and Crawford should not be held in civil contempt of this Court for failing to testify before the grand jury after each said witness had been granted immunity. Leave was granted and four separate pleadings were signed, sworn to and filed. Whereupon, the witnesses' counsel asked that the hearing be postponed for five days in which to prepare for the hearing. The Court denied this request but did order that the hearing be postponed until 10:00 A.M. on the following day, June 29, 1972.

25. On June 29, 1972, at 10:00 A.M., the grand jury reconvened in open court with all witnesses and their counsel, and Special Attorneys Alvey and Merkle and Assistant United States Attorney McCown; but due to other court business, the hearing began at approximately 10:30 A.M., and was concluded the middle of that afternoon.

26. Each witness knowingly and wilfully refused to answer questions properly propounded to him during the regular session of the grand jury on June 27, 1972, heretofore described in these findings of fact. Such questions were with-

in the purview of the Court's order of June 27, 1972, pertaining to such witnesses. In doing so, each witness separately, knowingly, deliberately and wilfully disobeyed the order of June 27, 1972, pertaining to him.

### Conclusions of Law

#### I.

The Court has jurisdiction to hear this civil contempt proceeding. 18 U.S. C., Sec. 401; 28 U.S.C., Sec. 1826; Marcus v. United States, 3 Cir., 310 F.2d 143 (1962), cert. den. 372 U.S. 944, 83 S.Ct. 933, 9 L.Ed.2d 969.

#### II.

, ■ It was proper for the Court to hear this motion at the time it did. Counsel for the witnesses insisted that each was entitled to five days notice under Rule 6(d), F.R.Civ.P. While that rule does fix a 5 day period as a general proposition, it gives the Court the discretion to shorten it. The part of Rule 6(d) which is pertinent here reads: "(d) A written motion, other than one which may be heard ex parte, and notice of the hearing thereof shall be served not later than 5 days before the time specified for the hearing, *unless a different period is fixed by the rules or by order of the court* . . . ." (Emphasis added). The propriety of exercising that discretion in favor of expediting proceedings relating to recalcitrant grand jury witnesses was recently upheld in United States v. Weinberg et al., 9 Cir., 439 F.2d 743 (1971).[9] The Court was of the opinion that under the circumstances of this case the hearing in this matter could be held promptly without prejudice to the witness, and that justice required a prompt hearing. Any experienced judge would know that the witnesses came to the grand jury session fully prepared to refuse to testify and to meet the consequences. All the witnesses were served with the grand jury subpoenas by at least June 16, 1972, in New York. By at least that day, each had employed Mr. Durkan,[10] one of the New York lawyers who has appeared here in his behalf. Before the lawyers left for Texas on June 18th, each witness engaged two more New York counsel to work with Mr. Durkan. One of them was Miss Doris Peterson who holds herself out as being specially qualified to represent subpoenaed witnesses who are resisting grand jury efforts to get their testimony.[11] The third lawyer is William Cunningham. Some idea of his competence in this field can be gained from the fact that he was selected to take the lead in the case over such specialists as Durkan and Peterson. His

---

9. In the Weinberg case, "the individual civil contempt proceedings were conducted *immediately* after the respective appellants had refused to obey the court's order to testify." (Emphasis added). 439 F.2d, at p. 746. The Court of Appeals held that Rule 6(d) gave the trial court the discretion to shorten the 5 day period, and that it did not abuse its discretion in doing so under the facts of that case. The case *sub judice*, with the strong showing of advance preparation by skillful lawyers gives even stronger support to the Court's action here.

10. Some of Mr. Durkan's background is well known. He was one of defense counsel in the recent trial of Father Berrigan, et al., Harrisburg, Pennsylvania. He is with the New York law firm, O'Dwyer & Bernstein, which successfully represented the appellant in the United States v. United States, District Court for Eastern

District of Michigan [407 U.S. 297, 92 S. Ct. 2125, 32 L.Ed.2d 752], in which the Supreme Court, on June 19, 1972, held a portion of the wiretapping statute unconstitutional.

11. Miss Peterson's affidavit, filed among the papers in the Tierney matter and offered in evidence by the witness as W Ex. 5 (Witness' Exhibit 5), says on the first page:

"2. Since December 1970, I have represented approximately twenty witnesses before several federal grand juries sitting in this and other districts. I have also worked closely with many attorneys throughout the country representing witnesses before other grand juries . . . ."

(The rest of the affidavit is a tirade against grand juries and their authority to compel witnesses to testify.)

conduct in these hearings confirmed that he is skilled in matters of this kind. The witnesses had at least 5 full days to confer with attorneys Durkan, Cunningham and Peterson before he appeared before the grand jury. All of them have stayed at the same hotel in Dallas since their arrival in Texas.[12]

All of the attorneys were present in the federal courthouse most of the day, Monday, June 19th. They represented the witness Tierney in the hearing held in this Court during the middle of the day, Monday, when he was granted immunity and instructed to give his testimony before the grand jury. They also represented Tierney in the same kind of contempt proceeding as this during the week beginning Monday, June 19th. It would be hard to believe that the attorneys for the witnesses were not well prepared for a contempt hearing before they left New York. Any lawyer experienced in litigation would know that they had their plan well worked out by the time they got to Texas. He would also know that they consulted with each witness and with each other in the evenings at the hotel where they were staying. They should have known from the early stages of their employment that a contempt hearing would be inevitable. If there was any question in their minds about it, all doubt should have been removed by the action in the Tierney matter. The notice given these witnesses was far more time than was given the witnesses in the Weinberg case, supra, where the contempt proceedings were held immediately after the witnesses refused to obey the court's order to testify. Here the motion was filed at about 2:00 P.M. on Tuesday, June 22nd, and the hearing held the next day at 10:30 A.M. Moreover this exact conten-

tion was decided in Tierney v. U. S., 5th Cir., No. 72–2333, June 29, 1972 (Footnote 1).

The conduct of the witnesses' lawyers during all the proceedings in regard to these matters shows that they were exceptionally well prepared.

■ It is in the public interest that matters relating to grand jury proceedings be handled as expeditiously as possible consistent with justice to individuals involved. The whole system of law enforcement would break down otherwise.

### III.

■■ Each witness was legally obligated to testify before the grand jury after each had been granted immunity under 18 U.S.C., Sec. 6002, and had been ordered by the Court to do so; and his wilfull refusal to obey such order made him subject to commitment for civil contempt. Tierney v. U. S., supra; Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212,[13] decided May 22, 1972; Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); United States v. Weinberg, supra; Licata v. United States, 9 Cir., 429 F.2d 1177 (1970); In re Grand Jury Investigation of Giancana, 7 Cir., 352 F.2d 921 (1965), cert. den. 382 U.S. 959, 86 S.Ct. 437, 15 L. Ed.2d 362; United States v. Coplon, 6 Cir., 339 F.2d 192 (1964).

Counsel for the witness argues that he was not guilty of contempt because in each instance he was asked a question, he refused to answer it until he had left the grand jury room and consulted with his lawyer. They cite in support of their contention the cases of Sheridan v. Garrison, D.C.E.D.La., 273 F.Supp. 673

---

12. As it pointed out in the findings of fact, it would be naive to think that the witness and his lawyers did not have any idea what the subject matter of the grand jury inquiry would be. A witness subpoenaed to testify before a grand jury would not hire even one lawyer, much less three of them highly specialized in the field, to help him get out of testifying unless he knew that the subject matter of the inquiry would be serious; and, in order to know that it would be serious, he would have to know what it was going to be.

13. *Kastigar* upheld the constitutionality of the immunity granted under 18 U.S.C., Sec. 6002.

(1967), and Chandler v. Garrison, D.C. E.D.La., 286 F.Supp. 191 (1968).[14] Each one of those cases grew out of a subpoena issued for a witness to appear before a Louisiana grand jury in New Orleans. The investigations were being conducted by Jim Garrison, the State District Attorney there, during the course of the stormy period of his administration. They held that the privilege of each witness against self-incrimination could be protected only by his having an opportunity to consult with his counsel about his answers to questions propounded to him in the grand jury room. Both cases are readily distinguishable from the present case on the ground that there was no lawful grant of immunity to the witnesses in them. The most that either one of the witnesses in those cases had along the line of immunity was only a personal assurance from Garrison and his assistant. The courts pointed out that such assurances were obviously inadequate to immunize the witnesses. In the present case, each witness was protected by immunity given under a federal statute which was only recently held to be constitutionally adequate to protect a witness against prosecution growing out of self-incriminating testimony.

No other cases have been cited by either side on this point, and none has been found by the Court.

It appears that justice and reason do not support this contention of the witnesses. In the first place, there is no necessity for protection against self-incrimination after the grant of immunity. In the second place, such a procedure would place it within the power of obstructionists to disrupt the grand jury process to the point where it would be meaningless. It would be virtually up to counsel how long the conferences would last. Counsel could claim on each occasion that they had to research the authorities or make an investigation of the facts. They could go into court on a motion after any question. Counsel say

they represent seven of these witnesses. It is not difficult to imagine what a mockery these lawyers could make out of the grand jury investigation if each one of the seven witnesses were allowed to leave the grand jury room to consult with their lawyers after each question propounded to them.

The real farce of this contention of the witnesses is shown by the facts in this case. Many of the same questions were asked each witness. Many of those same or similar questions had been asked of the witness Tierney by the grand jury on June 19, 1972. It is incredible to think that the lawyers for each witness had not discussed this line of questioning with the witnesses and was not fully prepared on the subject.

Somebody affected by this inquiry wants judgment day in this matter put off as long as possible. The lawyers for the witnesses are past masters at stalling and obstructionist tactics. The statute of limitation would run on any offenses involved in this investigation before the grand jury could complete its work on it if these witnesses (after being granted immunity) were allowed to traipse out of the grand jury room after each question to consult their lawyers. The lawyers would see that it did.

In view of the decision in the *Kastigar* case in May, 1972, counsel for the witnesses could not well argue that the immunity granted under Title 18, United States Code, Sections 6002 and 6003, was constitutionally inadequate in prosecutions or grand jury investigations involving violations of the laws of this country. They therefore say that the immunity is inadequate to protect them against prosecutions in foreign countries. It has been pointed out that there is actually no proof that the present investigation relates to any matters which would constitute violations of the laws of foreign nations; but the point will be noticed briefly.

The only case which has been found where this point was actually decided is

14. Chandler v. Garrison was decided by a three-judge court.

In re Parker, 10 Cir., 411 F.2d 1067, 1070 (1969). That case became moot [15] while a petition for certiorari was pending, and the judgment in it was therefore necessarily vacated and remanded for dismissal of the action. However, the following reasoning in that case on this question is sound:

". . . . The Fifth Amendment was intended to protect against self-incrimination for crimes committed against the United States and the several states but need not and should not be interpreted as applying to acts made criminal by the laws of a foreign nation. The ideology of some nations considers failure itself to be a crime and could provide punishment for the failure, apprehension, or admission of a traitorous saboteur acting for such a nation within the United States. In such a case the words 'privilege against self-incrimination,' engraved in our history and law as they are, may turn sour when triggered by the law of a foreign nation."

## IV.

█ The denial by the Government under oath in open court of the use of electronic surveillance was a sufficient response to the witnesses' request for the disclosure of such surveillance.

During the Government's presentation of its evidence on Friday afternoon, counsel for the witnesses questioned attorney Alvey under oath about any electronic surveillance on the witnesses or their lawyers and tried to raise the issue of electronic surveillance. The only support for the issue was the affidavit of Miss Peterson, the attorney who has made a specialty of trying to help witnesses avoid giving grand jury testimony. This affidavit had been filed in the

Tierney matter. She says in her affidavit that:

(1) On or about November 11, 1971, she and Leonard S. Rodberg of Washington, D. C., tested the New York telephone of Mr. Durkan and his associate or partner, Mr. O'Dwyer.

(2) She did not understand the results of the test; but Mr. Rodberg, a Ph.D. in physics, told her that the response was not normal and indicated that "a radio frequency type monitoring system had been applied to the telephone system."

(3) She and Mr. Cunningham had discussed the case several times with co-counsel Durkan and O'Dwyer over the suspect telephone.

(4) Rodberg would give an affidavit in support of the motion if the Court would grant a postponement.[16]

The attorneys for the witnesses withdrew an offer of proposed affidavits of the witnesses before they were signed and sworn to and after the Court ruled that the witnesses, since they were present in Court, could make and file such affidavits but would be subject to cross examination about their contents, and their contents only.

An issue might be made on whether the question of wiretapping or electronic surveillance was adequately raised. The affidavit of Miss Peterson was about as flimsy as a person could make. However, the contention will be treated as if it had been properly presented.

The Government was called upon to affirm or deny the use of wiretapping or other electronic surveillance as claimed by counsel for the witnesses or their attorneys. Mr. Alvey, the Special Attorney from the Department of Justice who has had supervision of the in-

15. It would naturally be expected that there would be a higher percentage of moot cases in this type of proceeding than in most others, because so many things could happen to make them moot. The witness could decide to testify. The Government could decide it did not need the testimony of the witness. The grand jury could be discharged.

16. No reason was given for not having procured the affidavit for the hearing.

vestigation and preparation of this matter from the beginning, denied that there had been any wiretapping or electronic surveillance of the witnesses in this matter. He said that he had checked with all Government agencies which had had any connection with the case and was informed that there had been none. Special Attorney Merkle, who had worked with Alvey, affirmed under oath that he knew of no such wiretapping or surveillance. Mr. McCown, the Assistant United States Attorney for the Northern District of Texas who is helping Mr. Alvey in the presentation of this matter to the grand jury, also affirmed under oath that he knew of no such activity. Counsel for the witnesses asked Mr. Alvey about electronic surveillance of the office telephone of attorney Durkan and the office and home telephones of attorneys Peterson and Cunningham. After a thorough check of the proper sources, which consumed most of the day, Monday, June 26, 1972, Mr. Alvey, in the hearing on Tuesday, June 27, 1972, affirmed under oath on the witness stand in the presence of all the witnesses and all their attorneys that there had been no electronic surveillance of the telephones named by the witnesses' attorneys on Friday. He was subjected to cross-examination. Attorneys Merkle and McCown also under oath made such an affirmation.

Such a denial was sufficient. "Of course, where the Government officially denies the fact of electronic surveillance of the witnesses, the matter is at an end and the witness must testify." Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972).

On the same facts, the Court of Appeals in the Tierney matter (No. 72–2333) held that the charge of illegal electronic surveillance was "without substance for the purpose of this motion for bail."

■ Each witness should not be admitted to bail pending his appeal from this order.

After the witnesses were committed for civil contempt, their counsel announced intention to appeal, and requested that each witness be released on his own personal recognizance. The Court refused the request. No motion has been made for the Court to fix the amount of a surety bond; but if it had been, the Court would have denied that too.

■ Unless the Court of Appeals wants to get in the position of having one panel deny bail and another panel allow it on almost identical facts, this question was settled by the decision on June 29, 1972, in Cause No. 72–2333, denying bail to Kenneth Tierney. If bail is denied to one, it should be denied to all.

■ Bail is not granted as a matter of course pending appeal from orders of commitment for civil contempt in this kind of cases. United States v. Coplon, 6 Cir., 339 F.2d 192, 194 (1964); United States v. Doe, 1 Cir., 451 F.2d 466, 469 (1971).

If bail should ever be denied a witness pending appeal from a judgment of commitment for civil contempt, it should be done in this case. There is, in my opinion, little hope for reversal. The rug was jerked from under these people when the *Kastigar* case held the immunity statute here involved to be constitutional and adequate. The appeal is a valuable tool for delay; and delay is most important in this kind of case. Each time these people run this matter beyond the expiration date of a grand jury, the Government has to start all over with the witness. 28 U.S.C., Sec. 1826(a)(2). Each witness is bound to know some matters that are very material to the investigation; otherwise, he would not be going to all this tremendous expense and effort to keep from testifying. The investigation involves some kind of terrorist activity. Whether the group involved is tied in with a terrorist movement in Northern Ireland

or is confined to one in this country, it is large enough and serious enough to warrant having two Special Attorneys from the Department of Justice in Washington, D. C., and three high powered legal defense specialists travel half-way across the country to Fort Worth for a substantial period of time. Such things as that do not happen in the ordinary, run-of-the-mill criminal case. The Court is far from convinced that the witnesses would want to come back if his commitment were upheld. The only indication that they would is the fact that they came here this time. That is far from conclusive. There have recently been as many as four convicted defendants[17] in this District who were fugitives on their appeal bonds at the same time. They made all appearances at the trial and at preliminary proceedings. They were seen around in their usual haunts even up to the time that it became known that their convictions had been affirmed; but they could not be found when the mandate got to the Clerk's office. They were willing to gamble right down to the last; but they fled when they found out they had lost.

This witness and the three others represented by these lawyers are worth too much to their group right now as tools of delay to leave at this time. By the kind of tactics which have been used in this case, they stand the possibility of prolonging the grand jury investigation indefinitely. There is plenty of time to flee between the time of the announcement of the decision of the appellate court and the return of the mandate.

Also, the knowledge they gain from the questions asked them before the grand jury could possibly give the people they are trying to protect valuable information as to what the Government knows.

Even if any witness were personally inclined to live up to his obligation under a bond to return in the event of an affirmance, the pressures that would likely be brought to bear on him in this kind of case could well change his mind. It is common knowledge that persons connected with terrorist groups are assisted in leaving the country and are given asylum in other countries which will not return them. If that did not happen, the witnesses could be intimidated into disappearing on their own or into giving false testimony. It is possible that the witnesses might not even be around if matters came to a showdown while they were out on bond.

Counsel for the witnesses claim that Crawford and Reilly are British subjects. If so, they have a ready sanctuary in a foreign country.

The author of this opinion believes in bail, and has been more than liberal about it during the more than ten years he has been on the bench. In his opinion, this proceeding might as well be dropped if the witnesses are released on bond.

## V.

Judgment will be entered decreeing that each witness, Paschal Morahan, Daniel Crawford, Mathias Reilly and Thomas Laffey, separately, is in civil contempt of this Court for his knowing, deliberate and wilfull refusal to answer questions properly propounded to him during the June 27, 1972, regular session of the grand jury impaneled by this Court, and that each such witness be committed to the custody of the United States Marshal of the Northern District of Texas until he purges himself of such contempt, or until the aforesaid grand jury is discharged, whichever occurs first.

17. They were defendants in different cases.